and Drug Enforcement Act. Thank you, Your Honor. When you're ready, counsel. Thank you, Your Honor. May it please the Court, counsel, Kirk Lenhardt of Jones-Fargus, on behalf of the appellants in this matter, the Stephanie-Cardona LLC. Obviously from the brief, we've raised three issues on appeal here. With the Court's permission, I'm going to focus on the two contractual issues. First, whether there's been a material issue of fact that existed in this case that precluded the district court from granting summary judgment on the issue of the implied covenant of good faith and fair dealing. What I'm talking about there is the interrelationship between Smith's conduct in this case and the construction of the shopping center. The second issue is a corollary to that issue, and that is whether an ambiguity exists in the contractual documents themselves that was in fact fed or enhanced by Smith's conduct, again, in aid of the development of this center. Because the covenant of good faith and fair dealing as it exists in the State of Nevada is basically fact-driven, it's necessary for me to basically step back a little bit and take the Court, if I can, through the development of this center, what happened in this case. In 1998, my client, the LLC, Stephanie Cardona, purchased 18 acres in Henderson, Nevada for purposes of development of a strip mall. Strip malls in Las Vegas, like in most areas, require an anchor tenant in order to be successful. Consistent with that requirement, Stephanie Cardona engaged in significant negotiations with three grocery chains, eventually entering into a letter of intent with the Smith's in 1999. The letter of intent clearly placed no obligations on Smith's. But from that point forward, Smith's became actively involved in the development process of this center. They engaged, or they acted, they worked with the consultants, they worked with the architects, they worked with the City of Henderson. As we know from the record, in September 1999, Smith's signed a purchase agreement, agreeing to now acquire six acres of the 18 acres so that they could build their grocery store within the center. What the developer was required to do from that point forward was grade the center and prepare a pad, a building pad, to be delivered to Smith's. The record is replete with Smith's involvement in the development of that center from the date of the purchase agreement forward. Their involvement became much more active. From that point forward, they attended project coordination meetings. Their architectural plans were submitted to the City of Henderson. A construction budget was finalized, all pre-closing. It was anticipated the center would close in February of 2000. Now, what happens to intercede? The record is clear. In November 1999, before the closing, before the final documents are executed, the REA agreement, the development agreement, Smith's begins to have doubts as to whether it will construct the store at that location. Smith's begins to reevaluate whether the competitive pressures in that neighborhood allow for the building of another grocery store. What had happened was a Walmart super center had gone in, a Vons had gone in, an Alberts had gone in, all direct competition. What Smith's did not do was notify, warn, or advise this developer that they were having second thoughts. Instead, they went ahead, went forward with the closing in February 2000. And with the closing, the two documents that led to the grant of the summary judgment were executed, the REA agreement and the development agreement. And they clearly have the language that we've had to live with in this litigation. And I mean, let me make it clear. Without any obligation to do so, Smith's intends to construct a commercial or retail building having approximately 66,000 square feet of floor area within the building area on the Smith's parcel. Arguably, as a result of this contractual language, Smith's had no obligation. They could proceed, but they could never breach the contract because they didn't have an obligation to build. Even assuming that is accurate, Smith's still had to live with the implied covenant of good faith and fair dealing as it exists in the State of Nevada. That's the difficulty we have in this case. It's clear under the Morris decision and under the France decision out of the Nevada Supreme Court that you can – you may not breach the letter of the contract, but the implied covenant exists outside the contract. And as a result of the implied covenant, a party may not act arbitrarily or unfairly to the other party to the contract to its disadvantage. I mean, the law is clear on this. So what is Smith's conduct here? Following February 2000, they again, they continue to push for the building of the center. They meet with the city. They push our people. Get this building, get this center built because we do not want the Smith's store standing alone. The record, our brief, is replete with citations to the record where Smith's is lighting the fire, Smith's is pushing the construction of this center. All and all the time, while they're pushing the construction of this center, they know that they are reevaluating whether they will build this store. My client, and I suggest it's a question of fact, was my client reasonably relying on the actions of Smith's? Did they reasonably believe the center was – excuse me, the building was going to be built? Were their actions reasonable under the facts and circumstances of this case? That's why the covenant, implied covenant of good faith and fair dealing is always factually driven. And that's the reason. Kagan, help me with the factual narrative. Okay, so Smith is pushing, let's get these other stores in there because we don't want – at least what they say is we don't want to be a standalone with waiting for these other stores because it will not make it, I'm assuming, that attractive for the other people to come in. Right. The other smaller stores need the anchor tenant, but the anchor tenant needs the other smaller stores. Absolutely. What's happening during this period with respect to the other stores? What's this – how much progress has been made with building them at the time when Smith finally says, I'm out of here? The center is virtually completed by that point in time. You have a big hole where the Smith's pad is, but you have the two wings of the center where the smaller stores are built. Most of the stores are leased out. Most are ready to go. The Smith's pad, at the time Smith's announced they're not going to build, has been delivered to Smith's. That's the construction pad. It was delivered, I believe, in September. What do you mean by a construction pad? That's different from the concrete slab on which the building was going to be built. Actually, that's the concrete slab that was going to be built. And I'm calling that the construction pad. But that pad has been poured or not poured? It had been poured and certified and accepted to Smith's in accord with their specifications. And that was in September 2000. Again, about two months before Smith's finally announces that they're not going to build. What is the effect of the buyback agreement or the so-called reprieve? It really has no effect in this case. A, for the reason that it expired. Number one. Why isn't that a contractual kind of a private law remedy that if Smith doesn't go ahead with the anticipated use of that pad and put a building on it, then the developer has a right to buy back the property? I don't think it's the sole remedy. The reason, again, is. It is part of the contract, though, isn't it? It certainly is. And it's a contractual remedy. But we're talking about two different entities here. One is the contractual remedy from the development agreement and the REA agreement. Other, the other remedy is the implied covenant. Due to their. Don't the cases hold that the implied covenant of fair dealing can't contradict or be inconsistent with the express terms of the basic agreement, the principal contract? I will agree with that general proposition. But the party's conduct cannot defeat the purpose of that contract. And what is the purpose of this contract? It's the construction of the center and the construction of the Smith store. Their conduct in pushing the construction of the center, pushing the completion of the pad, pushing the certification of the pad, made it highly difficult, if not impossible, for my clients to repurchase. Well, your client signed a contract that was written, apparently, by the other people. And their lawyers wrote it so that it's heads I win, tails you lose. I will have to agree with that. That is what the contract provides. Now, they went into that, more or less, we hope, with their eyes open. One would wonder, but leading back to the side a second, and again, I can't argue with you that the contract says what it does and that literally Smiths can't lose under the contract. They can't lose. We would like to build a store on this property, but we are under no obligation to do so. Right. It's hard to breach that type of contract. I couldn't agree more. That's why the thrust, the heart and soul of this litigation, from this appellant's standpoint, is the implied covenant. Because even with a contract that literally can't be breached, there's still an obligation to perform in a fashion to not harm the interests of the other side. What should Smiths have done here? They could have at least warned this developer, as of November, that we may be re-evaluating. You may want to slow down. You may not want to get that construction loan that's going to drive you into bankruptcy when you can't fulfill its terms. You may not want to finish this center. You may want to leave that dirt bare until we decide what we're going to do, and that's where the damage occurred, and that's outside the contractual provisions. And that's why, again, with all deference to Judge McKibben, those are factual issues that should have gone to the jury. Was the reliance of my client reasonable on the actions of Smiths in the context of this contract and the context of the facts of this case? Was Smith's conduct reasonable under the facts of this case? Was it reasonable for Smiths to wait a year to tell us what they were doing? And, in fact, what led to them telling us what they were doing? It was a letter sent by the developer saying, you've got the pad. When are you going vertical? And you saw the response from Smiths. It was basically in your notes. Smiths has absolutely no obligation to construct a store. Whether we do or don't is entirely within our discretion, and may well be that we delay or even cancel plans. This is in late October 2000, almost one year after they knew they were reevaluating. How difficult would it have been for Smiths to pick up the phone in November and say, you may want to slow down, irrespective of the fact we can't breach the contract. You may want to slow down to protect your interests. And that's the issue of fact that should have gone to this jury. My problem is not that Smith took advantage of the situation and took advantage of your client. Assuming that the story you tell is true and for purposes of whether we go to a summary judgment, I'm assuming that the story you tell is true and your gloss on the facts is the right gloss. Why is that unfair, given the nature of the contract? That is, good faith and fair dealing with respect to the contract they've got. No matter how onerous a contract is, and this one meets the onerous standard, I think, from the developer's standpoint. No matter how onerous that contract is, there is some duty to act in good faith, no matter how disadvantaged the other party is. And I refer back to the Hilton v. Lewis case, which, you know, kind of defined the implied covenant in Nevada back in 1990 or whatever. What's the purpose of this contract? It's to build the Smith store. Could you review the procedural betting on this case? I'm sure it's in the record, but I do not know what it is. Was this case originally filed in Federal district court or was it removed? It was filed in State court and removed by the Smith people. Okay. Again, focusing on Hilton and realizing that on the onerous standard, we're on the losing end of the contract. Where one party performs a contract in a manner that's unfaithful to the purpose of the contract. Now, Smith is deciding not to build it. But as I read the contract, the purpose of the contract from the Smith side is the purpose of this contract is to give us everything and you nothing. I agree with that. And with nothing. And that's what happened. Well, I'll go along with that also. But with nothing, like we have here, don't they owe us a 1 percent obligation to at least give us the courtesy of notice? And isn't that an issue of fact that's going to the jury? I mean, realizing in the scale of things, it's like this, on the contractual rights and duties. Don't they have one duty? To at least give us the common courtesy and decency of a call to notify us that we're not going forward and that you're taking an awfully large financial risk. Where does it end? Now, I understand that there's been a bankruptcy for your client and I assume this bankruptcy with permission of the bankruptcy judge or whatever. That and the bankruptcy, in fact, was successfully concluded. So we're finished with that. Right. Am I correct in assuming that your client no longer owns this shopping center? Is that right? They sold it. That's correct. They sold it. What's happened at the shopping center? There's two wings and a big gap. It is still not built. There's still no anchor tenant, which in Nevada is basically suicide because you end up giving away your other retail space. Now, are the other retail stores operating or do we have big gaps in those, too? There are some gaps. I understand we're outside the record. They are operational. Can I identify at this time each store that is there and how they're doing since my client sold it? No, I can't. And that's outside the record. Okay. With the Court's permission, I've still got about four and a half minutes. I'd like to reserve that for rebuttal if I can. May it please the Court. James Kilroy for Smiths. The piece that's missing, I think, from the factual rendition is the repurchase agreement and the significance of that. This was an important piece of the overall contract that may shed some light on why I don't think the contract is perhaps as onerous as this Court may believe right now. The repurchase provision was actually drafted by counsel for Stephanie, and that's part of our record as we described how that came to be. And why do I think that's significant? Because at the end of the day, I think it shows what the real overall purpose of this contract was, not only from our standpoint but in real terms. Quite simply, this contract gave Stephanie Cardona the opportunity to work with an anchor tenant with the hope that we all had of developing a bigger development. But there was a recognition in light of the language in the two paragraphs that we've cited, that's paragraph 6, I believe, of the development agreement, and paragraph 15 of the, we're calling the REA, that there was not an obligation on the part of my client to proceed with opening the store. Now, why would Stephanie enter into such an agreement? Because there are several reasons that didn't come up in the factual rendition. One, along the way, we are, let me back up, I think there's a concept that from the beginning there's evidence that we had no intention of performing, of opening the grocery store, and that's not the case. The facts that we've presented show a mutual intention, in fact, to proceed to open the store. At the same time, my client has negotiated the right to evaluate whether, in fact, to proceed to open the grocery store. So these are not mutually exclusive things that are going on. There is a development that's joint, and as part of that, my client is paying. And this is, again, in our factual rendition, we're paying our prorated share of the costs of development. So along the way, there's a benefit to Stephanie in terms of doing business with us, and then there's certainly a benefit if we choose not to open the grocery store, in that they have the right to repurchase. So I just wanted to address. How much was your client paying during the course of the development before your client finally says, we're out of here? The facts and the record, there are two references, in my recollection. One was to a figure of about $4 million, but in fairness, I think that figure also took into account the purchase price. Remember, we actually purchased the property. The other figure that comes up is a figure of about $1.3 million. That's the prorated share of the costs of development that we were contractually obligated to pay along the way. That's my understanding of that. And when's the last check that you cut with respect to that $1.3 million? I don't know. Not in the record? It's not in the record. Does your client still own that property? I believe they do. I'm hesitant because I tried finding that out yesterday, but I believe they still do. Again, this is we're talking about the facts, and I just am sort of making a long-winded point of saying that this may appear to be an onerous contract, and I'll give Stephanie and the Court that at first blush. But there was more going on, and at the end of the day, there's not just a contract, but as you can see from our record, there's a series of exchanges that clarify that this was, everyone went into this with their eyes open. The repurchase obligation, not obligation, but repurchase provision I think couldn't be more clear that if we chose not to open the grocery store 18 months from the date of February of 2000, there would be a right on Stephanie's part to repurchase. There was actual discussion about that leading up to the date at which Smith's, my client, informed Stephanie that they had no intent to open within a certain period of time that they were putting that on hold. Now, why is that all relevant? We're focusing, and I am really in response here, focusing, I think, on the covenant of good faith and fair dealing claim. There are other claims, but as the Court noted in conversation with counsel, fundamentally, to the extent there's an implied duty of good faith and fair dealing, it cannot contradict terms of the express contract. And I think the term that counsel is suggesting should be implied is some kind of term that requires disclosure of what we're doing every step of the way. That's inconsistent with the overall two contracts, the dates by which we have to open, and most importantly, the fact that we don't have to do this at all. Why is that inconsistent? I agree that it would be a supplementary to your duties, but why is it inconsistent? I mean, you could have been saying, listen, we may back out, but you didn't say it. But there was nothing in the contract that forbade you from saying that if you were thinking it. There is nothing in the contract that forbid us. There's nothing in the contract one way or the other on the issue. What there is, what there is in the contract is, I think, a mutual acknowledgment that there's not an obligation to open this grocery store, and this is, I guess, my point, at some point in time, if we haven't opened, then they can repurchase. Now, implicit in that dynamic, I think, is an absence of any obligation to, on a daily basis, tell you what we're thinking. Yeah, but they don't ask for a daily basis. They say once would have helped. Once would have helped, and I think the chronology is important here, and there's some, I think, confusion in the record that I do want to address real quick, involving exactly when my client made decisions and so forth, because ultimately the record will show that there was an ongoing analysis, totally appropriate, not inconsistent with the contract or the way this business works, that at some point several weeks before we notified Stephanie a decision was made, and within a very short period of time that was communicated to Stephanie. The confusion is addressed just for the record in our reply to the motion for summary judgment. Specifically, there was an indication that a decision had been made as early as July of 2000 that was not communicated until November of 2000. A close review of the record, as we more articulately present in the reply in support of the motion for summary judgment, shows that that decision was made. In August of 2000, Smith pushed back the opening date. How was that notice of that given to Stephanie? I believe that was. I believe that that's undisputed, that there was notice given of pushing back. At that time, the anticipated opening date had been between sometime between November and December of 2000, and it was pushed back to April. Then, now, this was in August. So then you've got September, nothing happening apparently. And in October, Stephanie wrote the letter to inquire about what's going on. And just to back up a little bit more to flush out where I think there could be confusion, and counsel, correct me if I'm wrong, but there's a reference to a vice president of my client, Smith, reviewing an analysis that occurred in July. And in his deposition, he agreed that that analysis was relevant to a decision to postpone somewhat indefinitely the construction, but that decision occurred in October. Again, we're talking, from my standpoint, to the extent there wasn't daily disclosure of our mental thought process. I haven't looked at the depositions. But in a lot of these cases, the supermarket shopping center developments, there's quite a lot of publicity in the local paper. There's somebody, there's usually a demonstration against Walmart somewhere, and there's a lot of editorial comments and radio telephone conversations and so forth. In the depositions, did anybody mention any of the uproar about this competition analysis going on, of other stores coming in? My recollection is that the topic of the significant competition in this market came up amongst the executive group of my clients in that period, again, beginning in July when an analysis is done through November. And when did they decide to push back the opening date? I believe the date was October 19th that the executive team made a decision. So there was an ongoing dialogue, for sure. I'm not pretending like it just cropped up on that date, but the decision was made very shortly thereafter. And prior to any expiration of the 18-month period, we did let these folks know. We had no reason not to. And that's, again, one of the things that may distinguish this case from a different type of case. There's no indication that we somehow were leading on Stephanie for some benefit to ourselves. In fact, what we were doing was in complete compliance with the contractual dynamic, which is jointly developing, supporting, intending to open while evaluating, as was our right, which leads me, if I may, unless the Court has a question on that topic. Well, what I'm really trying to figure out, and you may be able to help me on this, I'm trying to figure out, because I don't know Smith's, I don't know the community and so on, how big an outfit is Smith's? Where are the other stores? How large are the other stores? How large was this store going to be by comparison to the Albertsons and the direct competitors and so on? I'm trying to figure out, is Smith's a, you know, are they a strip mall sort of grocery store? They're in the same family as the Albertsons of the world, the King Soopers of the world. So they're a significant grocer nationwide. And that's what was contemplated, that it would be a significant anchor tenant for this mall. And the square footage of that store would be roughly the same square footage as the Albertsons store that went up that's a competitor? Roughly. Okay. I want to take a little bit of time shifting to the negligent misrepresentation case because that involves an economic loss doctrine issue, which is, I think, a little bit different than what we've been talking about here. And the bottom line is the claim, I think, in evaluating the negligent misrepresentation claim, it's important to look at the allegations, of course, that were pled in the amended complaint, and then the law, and there's not enough. Nevada substantive law, there's some that I'll cite too, and there's a recent federal district court case, the Arrington case, that I think this Court may be hearing today as well, that involves these issues. They still recognize the difference between tort law and contract law in Nevada? They do. So we're okay on that. The bottom line here is that the allegations of the negligent misrepresentation claim are broad, and you start with an allegation that I think. Did you say broad or fraud? Broad. Let me be clear on that one. Broad, and focused on negligence, as the cause of action title would indicate. They start with an allegation, essentially, that Smiths entered into these contracts, including the provisions that did not obligate them to open, calling them boilerplate and having no intention of performing. And then they go through a laundry list of allegations that suggests that along the way, we were misleading Stephanie about what we were going to do. We insisted on certain schedules for construction, so on and so forth, and that that broad set of factual allegations was negligent in nature and not fraudulent, and this is important for my point. Ultimately, and I think in analyzing the impact of the economic loss doctrine, you do have to look at the allegations of the complaint, of the cause of action, to determine whether it's intertwined, whether the allegations are intertwined with an express contract or whether they're independent. And the Callaway case that we've cited and the Yarrington case that we've cited have, I think, a pretty good exposition of how the law works in this context. You may be aware that Yarrington follows you today? Yes. Okay. And I'll wait around for that one. At the end of the day, the simple analysis is those claims that are duty-based as opposed to promise-based, sound and tort, those claims that ask for economic damages are contract-based, and the economic loss doctrine takes out negligence claims that are really directed at performance of contractual terms. I think if you look at the allegations of the negligent misrepresentation claim, it's very different than the kinds of claims that the Yarrington case suggests may survive the economic loss doctrine, those being fraudulent inducement type claims. And with that, again, in the analysis we've presented in our briefs, I would say that that claim fails under the economic loss doctrine. Let me ask you on a procedural issue. I assume you persist in your position that the notice of appeal was not timely in this case. Is that right? I'm sorry, that the notice of appeal was not timely. Yes. Is that right? I do. It's this is a close one because of the unusual, I think, formatting of the papers.  I don't have anything to add. It's not in the brief. I'm glad to repeat the analysis. It's simple. No. I think I got it from your brief. But my follow-up question is, if we find that argument to be timely and dismiss the appeal, then your cross-appeal just falls away. Do you agree with that? I do. All right. That's my only question on that. And I'm done unless there are any other questions. Thank you. Mr. Butler. Thank you. In referring back to the applied covenant, if I can for a second, let me remind the Court that the contracts we're referring to had two specific attachments. One's construction standards, that the center be built in accord with Smith's standards. And two, a construction timetable, that the center be built in accord with Smith's standards. These attachments clearly play into the analysis of the implied covenant and, as Your Honor pointed out, analysis of the contract and how they interrelate. When we go back to November 99, when Smith's began the reevaluation process, like any corporate entity, it takes them a while to determine whether they're going to build or not, whether they're going to change their mind or not. I give them that, and it's fair. All I'm saying is once they've made the ultimate decision by July, there's an eight-month period of time that they're reevaluating. At a minimum, the implied covenant should have at least given us the courtesy of one notification, one call, that Smith's was at least engaging in the reevaluation process. We're not privy to their processes. We're not privy to their meetings. We're not invited in. All we're privy to is a timetable and standards that have to be met. And I'm suggesting to this Court if we would have been given that call, been given that warning, we wouldn't be here today in the posture that we are. There was a reference to what is going on with the other centers and the other grocery stores. What probably caused reevaluation by Smith's was, one, the existence of a Walmart supercenter that went within about two miles from the center. The second thing that probably influenced the Smith's decisional process was the fact that Albertson's beat him to the punch and built a grocery store across the street and a strip mall located across the street. The ‑‑ I realize one of the justices or one of the judges suggested you weren't aware of the market or the situation in Las Vegas. As you know, Las Vegas is a rapidly growing community. Henderson is now the second largest city in the state of Nevada where this center is located. It is a suburb of Las Vegas. And to say there are a large number of strip malls and a large number of anchor tenants and grocery stores all through these areas is probably a broad understatement. So there's nothing really to warn my client at this point in time that there would be a reevaluation process ongoing by Smith's due to the simple fact that the other grocery stores were being constructed. The only way we would have known was for Smith's to give us the courtesy of the notification. With that, I only have about a minute and a half left. I've really summed up my remarks. Unless there are ‑‑ This may be just off remark, but on the ‑‑ there was a line of credit or a construction loan or something, a well fire where somebody was ‑‑ Bank of America was fronting some of the construction money. There was an initial bridge loan. And then in June 2000, I think it was June 30th, Bank of America approved the $12 million construction loan. There are always ‑‑ How was that secured? By the property itself. They had a first trust deed on the whole 20 acres? Yes, sir. On the 18 acres. Yes, sir. 18 acres. And like any construction loan, there are requirements. You have to get it leased up by a certain period of time. You have to have it built by a certain period of time. Needless to say, if we had known there was a reevaluation process going on, they would not have gone to the bank and got that construction loan and put an 18‑acre parcel at risk that has significant inherent value. Okay. Thank you very much. Thank both of you for useful arguments. The case of Stephanie Cardona v. Smith's Food and Drug now submitted for decision. The last case on the argument calendar this morning is Giles et al. v. GMAC.
judges: Goodwin, Tashima, W. Fletcher